856 F.2d 1250
 129 L.R.R.M. (BNA) 2201, 57 USLW 2179,
109 Lab.Cas. P 10,715,
10 Employee Benefits Ca 1662
 TEAMSTERS CANNERY LOCAL 670, affiliated with International
Brotherhood of Teamsters, Chauffeurs, Warehousemen
and Helpers of America,
Petitioner/Cross- Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
Stayton Canning Company Cooperative, and Agripac, Inc.,
Intervenors/Respondents.
 Nos. 85-7413, 85-7478.
 United States Court of Appeals,
Ninth Circuit.
 Argued May 5, 1986.
Submitted July 30, 1987.
Decided Sept. 1, 1988.
 
 Henry H. Drummonds, Monica A. Smith, Theodore R. Kulongoski, Portland, Or., for petitioner/cross-respondent.
 Charles Donnelly, Washington, D.C., for respondent/cross-petitioner.
 Petition for Review and Application for Enforcement of an Order of the National Labor Relations Board by the National Labor Relations Board.
 Before ALARCON, REINHARDT and THOMPSON, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 The question we must answer in this case is whether the record contains substantial evidence to support the National Labor Relations Board's (NLRB) finding that Teamsters Cannery Local No. 670 (Union) violated express provisions of a strike settlement agreement prohibiting discriminatory retaliation against financial core members when it denied those that crossed a picket line the opportunity to use facilities open to them prior to the work stoppage.
 
 I PERTINENT FACTS
 
 2
 Stayton Canning Company Cooperative (Stayton) and Agripac, Inc., (Agripac) (collectively employers) own food processing plants in the state of Oregon. Each employs 700-800 regular full-time employees. Stayton and Agripac also employ approximately 2800-3200 additional persons each season. The Union represents approximately 98% of the regular and seasonal employees.
 
 A. Pre-Strike Benefits
 
 3
 The Union negotiated separate but substantially similar collective bargaining agreements with Stayton and Agripac. Each agreement contains identical "union security" provisions, that require unit employees to become and remain union members "in good dues standing." The contracts also include identical provisions concerning health and welfare benefits.
 
 
 4
 Both employers are required by the collective bargaining agreements to contribute to the Oregon Processors Employees Trust (OPET). OPET provides qualified employees with coverage under insurance plans that include, among other things, prescription drug, dental and eye care benefits. Under these plans, the employees may choose any pharmacy, dental, or eye clinic. OPET reimburses the majority of the employees' costs. The pharmacy plan provides for 90 percent reimbursement; thus, the employees end up paying only 10 percent of the cost. The OPET dental and eye care plans reimburse the employees for all but certain minimal payments.
 
 
 5
 The Union occupies a small office building in Salem, Oregon. In addition to the Union offices, the building also houses a pharmacy, a dental clinic, and an eye clinic. The Union's executive board and the boards of directors for the pharmacy and the clinics are identical. The clinics and pharmacy operate as self-sustaining nonprofit businesses. They are open to the general public, as well as union members.
 
 
 6
 The pharmacy accepts union members' plan-paid insurance benefits as full payment for prescriptions it fills and bills the OPET fund directly. As a result, union members are afforded the convenience of receiving prescription drugs at the pharmacy without having to pay cash and wait for reimbursement from OPET. In addition, they are spared the additional 10 percent cost they would otherwise have to bear if they went to a different pharmacy. The dental and eye clinics also bill OPET directly. Thus, union members do not have to pay cash and await reimbursement for the insured portion of the dental and eye clinics' services. Union members may receive dental and eye care services from clinics in the union building and pay cash only for the minimal payments not covered by the insurance. Customers other than union members pay cash for the use of the pharmacy and the clinics.
 
 
 7
 As another benefit, the Union, upon request, provides all laid-off members with work registration certificates. Pursuant to an agreement between the Union and the Employment Division of the State of Oregon, members who present such certificates may receive unemployment compensation without having to establish that they searched for a job, as is ordinarily required of claimants for unemployment compensation. This benefit is not spelled out in either of the collective bargaining agreements at issue here.
 
 B. Post Strike Changes on Benefits
 
 8
 During the summer of 1982, the Union and the employers engaged in negotiations for new collective-bargaining agreements. On July 25, 1982, the Union asked the employees to cease work and strike because the contract negotiations had failed to produce new agreements. The strike against Stayton lasted 4 days. The strike against Agripac went on for almost 2 weeks.
 
 
 9
 Some of the employees did not support the strike; they either continued to work or returned to work during the work stoppage. In addition, the employers called in strike replacements. Between 600 and 700 of the employees who worked during the strike notified the Union in writing that they would pay the monies required under the contractual union security provision but, nonetheless, would not be bound by membership obligations. These employees are referred to as financial core members. See NLRB v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963) ("Membership" in a union as a condition of employment may require only the payment of fees and dues and is therefore "whittled down to its financial core."). Prior to the strike, the Union had no financial core members. Only those who worked during the strike became financial core members.
 
 
 10
 The strikes ended on July 29, 1982 (Stayton) and August 8 or 9, 1982 (Agripac) when the parties reached a consensus on the terms of the strike settlement and new collective-bargaining agreements. The terms of the collective-bargaining and the strike settlement agreements formed part of a single package. The strike settlement agreements with Agripac and with Stayton were identical in all respects material to this case. The strike settlement agreements provided that neither the employer nor the Union would retaliate or discriminate against any employees who chose to be financial core members during the strike.
 
 
 11
 The agreements read, in pertinent part, as follows:
 
 
 12
 The parties have agreed that it is in the best interests of the company, the union, and all employees that any bad feelings or disharmony in the plant generated by the strike be eliminated as soon as possible in the interests of efficient operations; and that no employee should suffer discrimination, harassment or intimidation by virtue of choices made to support or not to support the strike; and that every employee is entitled to a working environment free from acrimony and hard feelings.
 
 
 13
 The union and the company hereby agree that no employee shall be discriminated against in any way by virtue of lawful activity engaged in during or in connection with the strike....
 
 
 14
 Neither party shall discriminate or seek any penalty from any employee, including supervisory employees, because of their choices or actions with respect to financial core status or resignation.
 
 
 15
 In December 1982, less than five months after the date of the strike settlement agreement, the Union's executive board voted that it would no longer provide work registration certificates to financial core members. On the same day, the members of the Union's executive board, sitting as the board of directors of the clinics and pharmacy located in the union building, voted not to provide any future services to financial core members.
 
 II PROCEEDINGS BEFORE THE NLRB
 
 16
 Each of the employers filed separate unfair labor practice charges with the NLRB alleging that the Union's decision to deny pharmacy, dental, and eye care benefits to financial core members violated the strike settlement agreements. The NLRB consolidated the two cases for hearing. The complaint filed by the NLRB, as amended, alleged (1) that the Union had failed to abide by, and had unilaterally modified, the terms of the strike settlement agreements; (2) that the Union had restrained and coerced certain employees, in violation of section 8(b)(1)(A) of the Labor Management Relations Act of 1947, 29 U.S.C. Sec. 158(b)(1)(A) (1982), by refusing to allow them to use the pharmacy and the clinics, and by refusing to issue work registration certificates, because these employees had assumed financial core status in the Union during the 1982 strike; and (3) that the Union had violated sections 8(b)(3) and 8(d) of the Act, 29 U.S.C. Secs. 158(b)(3) & (d) (1982), by the same actions because the actions were in derogation of the strike settlement agreements.
 
 
 17
 On November 8, 1983, a hearing was held before an Administrative Law Judge (ALJ). In an order and decision dated February 23, 1984, the ALJ found that the Union violated the terms of the strike settlement agreements when it refused to issue work registration certificates to unemployed financial core members and when it ordered the pharmacy and clinics in the Union building to refuse service to financial core members. The ALJ also found that because the Union violated the strike settlement agreements, it violated section 8(b)(1)(A) of the National Labor Relations Act (NLRA or Act). Finally, the ALJ found that the Union unilaterally adopted and enforced "a union policy or rule which is in derogation of rights guaranteed the employees by the terms of the contract ..." and that such action violated sections 8(b)(3) and 8(d) of the NLRA.
 
 
 18
 Having found violations of the NLRA, the ALJ recommended compensation for those financial core members who had financial losses and recommended that the Union "cease and desist" the illegal conduct. The ALJ recommended that identification of the financial core members owed a remedy be left to the compliance stage of the proceedings.
 
 
 19
 The Union filed exceptions to the ALJ's decision with the NLRB. The NLRB adopted the recommended order of the ALJ with a minor modification that is irrelevant for purposes of this appeal. Teamsters Cannery Local 670 (Stayton Canning), 275 N.L.R.B. 911 (1985). The Union filed for review in this court. The NLRB, in turn, filed an application for enforcement of its order. We granted motions filed by the employers for leave to intervene in support of the NLRB.
 
 III DISCUSSION
 A. Standard of Review
 
 20
 We will enforce an NLRB order if substantial evidence on the record viewed as a whole supports the findings of fact and the correct law was applied. NLRB v. Rockwood & Co., 834 F.2d 837, 839 (9th Cir.1987) (citing NLRB v. Nevis Indus., 647 F.2d 905, 908 (9th Cir.1981)). "If the [NLRB's] findings are supported by substantial evidence, we must enforce them, even if we might reach a different conclusion from the same evidence." Id. In performing our appellate duties, we may not "displace the [NLRB's] choice between two fairly conflicting views" of the evidence "even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). In addition, the Supreme Court has instructed that,
 
 
 21
 [t]he [NLRB] has the primary responsibility for applying " 'the general provisions of the Act to the complexities of industrial life.' " Ford Motor Co. v. NLRB, 441 U.S. 488, 496 [99 S.Ct. 1842, 1849, 60 L.Ed.2d 420] (1979), quoting NLRB v. Erie Resistor Corp., 373 U.S. 221, 236 [83 S.Ct. 1139, 1150, 10 L.Ed.2d 308] (1963), in turn quoting NLRB v. Steelworkers, 357 U.S. 357, 362-363 [78 S.Ct. 1268, 1271-72, 2 L.Ed.2d 1383] (1958). Where the [NLRB's] construction of the Act is reasonable, it should not be rejected "merely because the courts might prefer another view of the statute." Ford Motor Co. v. NLRB, supra [441 U.S.] at 497 [99 S.Ct. at 1849].
 
 
 22
 Pattern Makers' League of North America v. NLRB, 473 U.S. 95, 114, 105 S.Ct. 3064, 3075, 87 L.Ed.2d 68 (1985).
 
 B. The Strike Settlement Agreement
 
 23
 As noted above, the strike settlement agreements provided in pertinent part that, "the union and the company hereby agree that no employee shall be discriminated against in any way by virtue of lawful activity engaged in during or in connection with the strike...." Notwithstanding the clarity and unlimited scope of these words, shortly after the execution of the strike settlement agreement, the Union's executive board formally voted to withdraw from financial core members the right to benefits enjoyed by full union members to work registration certificates and service at the Union controlled pharmacy, and the dental and eye clinics. The NLRB, after reviewing the record, found that that action was taken in violation of the strike settlement agreements to punish financial core members for crossing the picket line. Stayton Canning, 275 N.L.R.B. at 916. After reviewing the record, we have concluded that there is substantial evidence to support this finding.
 
 
 24
 The evidence is undisputed that the only victims of the Union's discriminatory policy were the financial core members who crossed the picket line. At the time of the filing of these unfair labor practice charges, each of the financial core members was expressly protected from discriminatory reprisal by the strike settlement agreement. The record also contains substantial evidence to support the NLRB's finding that the Union's decision was motivated by a discriminatory animus, a desire to punish financial core members economically or to coerce them into full union membership.
 
 
 25
 Union Office Manager Grace Hayward testified that after the Union's executive board voted to deny financial core members the benefits described above, Union Secretary Treasurer L.B. Day instructed her that financial core members could not use the health care facilities located in the union building. Hayward stated that pursuant to Day's orders, she highlighted the names of financial core members with a red marking pen and distributed copies to the pharmacy and the dental and eye clinics with instructions not to serve those members. Thereafter, employees of the pharmacy and the clinics refused service to financial core members.
 
 
 26
 Financial core employee Roger Elmore testified that he was told by a pharmacist that he could not fill a prescription at the union pharmacy because Elmore's name was "on a list." Elmore stated that he went upstairs to the Union offices to seek an explanation from Union Business Agent Marty Dolan. According to Elmore, Dolan explained to him that his conversion to financial core status was the cause of his inability to receive service at the pharmacy. Elmore also testified that Dolan "said the executive council had told them that if you didn't want to have anything to do with the union, then the union was going to have nothing to do with you, and I could no longer use the facilities there of any kind."
 
 
 27
 Another financial core member, John Gunn, testified that when he complained to Grace Hayward about being denied service by the pharmacy, she told him, "you crossed the picket line, signed financial core, and you can't use the facilities any more." Gunn said Hayward told him that "anybody who crossed the picket line wasn't going to be able to the [sic] facilities." Gunn inquired of Marty Dolan how he could reinstate his full membership. Dolan advised him that he would have to write a letter explaining "why you signed financial core and crossed the picket line and why you wanted to be reinstated."
 
 
 28
 When Nancy Gunn, the wife of another financial core member, went to the Union office and requested a prescription card, necessary to use the pharmacy in the building and receive the benefit of its direct billing to the OPET, she was told by an office worker that she "could not get the prescriptions because Tom [her husband] had crossed the picket line."
 
 
 29
 An Agripac seasonal employee, Rosalie Walker, who became a financial core member and worked during the strike, testified that she was denied a work registration certificate and was told by someone in the Union's office, "I'm sorry, we cannot sign your form because you crossed our picket line."
 
 
 30
 The Union attempts to justify this retaliation against financial core members by referring us to NLRA section 8(b)(1)(A). Section 8(b)(1)(A) provides that a labor organization has the right "to prescribe its own rules with respect to acquisition or retention of membership...." The Union concludes from this language that Section 8(b)(1)(A) authorizes it to restrict the benefits it offers to full members as an inducement to financial core members to step up to full membership status. There is substantial evidence in this record to support the NLRB's finding that the Union's discriminatory actions against financial core members were not taken to encourage financial core members to resume full membership status.
 
 
 31
 Beverly Bowers, an Agripac employee, testified that in February 1983 she wrote a letter requesting to be reinstated to full membership status. Bowers stated that in June 1983 she talked to Union Business Representative Bob Weekly about the delay in processing her request. Weekly stated that her letter had to go before the Union board and he was not sure when that would be. Bowers also testified that, two weeks prior to the November 8, 1983 ALJ hearing she conferred with Marty Dolan about her request. Dolan told her that her letter was still pending and had not been ruled upon.
 
 
 32
 Eunice Castleman, another Agripac employee, testified that Bob Weekly told her that she could write a statement to support her request to be removed from financial core status. Castleman sent a request to the Union board to be removed from financial core status on January 24, 1983. She called the Union regarding her application at least two times. As of the November 8, 1983 ALJ hearing, she had received no response from the Union.
 
 
 33
 Joseph Nelke, another Agripac employee, testified that in February 1983 he filled out a form to regain full membership status. As of the hearing before the ALJ he had not been reinstated.
 
 
 34
 The Union's failure to act on the requests by the financial core members to regain their full membership status supports the NLRB's finding that the Union was acting in retaliation for strike related activities and in violation of the strike settlement agreements. It was proper for the NLRB to infer, from the Union's failure to act upon these requests for reinstatement to full membership, that the purpose of its December 1982 discriminatory action against financial core members was to punish them for crossing the picket line.[1]
 
 
 35
 At the hearing before the ALJ, it was stipulated that the pharmacy and clinics were open to the general public and not restricted to union members. However, after the Union's discriminatory action in December 1982, financial core members were refused all services. Thus, while members of the general public were allowed to patronize the clinics, financial core members could not use the facilities even if they paid cash.
 
 
 36
 Kim Hatfield, a Stayton employee and Patricia Gunn, John Gunn's wife, both testified that they were not allowed to pay cash for prescriptions filled at the pharmacy. They were told that no prescriptions could be filled for financial core members and that they would have to go to another pharmacy. Beverly Bowers and Ruth Dunn, the wife of a financial core member, also testified that they were refused service at the eye clinic. Furthermore, Bowers testified that she was refused service at the dental clinic. Grace Hayward testified that the Union's secretary-treasurer L.B. Day "said that the board of directors had met and they had made the decision that financial core members were not entitled to use the Labor center pharmacy, the dental clinic, and the vision." (Emphasis added).
 
 
 37
 If the Union did not intend to punish the financial core members, it would follow that they would at least be accorded the same right to use the union building facilities available to the general public. The fact that they were denied all use of the facilities provides additional support for the NLRB's finding of retaliation and violation of the strike settlement agreements.
 
 C. Section 8(b)(1)(A) Claim
 
 38
 The NLRB held that the Union "violated Section 8(b)(1)(A) of the Act when, in derogation of the terms of its strike settlement agreements with the Employers, it refused to allow the pharmacy and eye and dental clinics in its building to do business with its financial core members employed by the Employer and refused to issue them work registration certificates." Stayton Canning, 275 N.L.R.B. at 917 (footnote omitted).
 
 
 39
 Section 8(b)(1)(A) of the NLRA makes it an unfair labor practice for a labor organization "to restrain or coerce ... employees in the exercise of the rights guaranteed in section of this title: Provided, that this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein...." Section 7, 29 U.S.C. Sec. 157 (1982), gives employees the right to refrain from labor organization activity "except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment...."
 
 The Supreme Court has held that
 
 40
 Sec. 8(b)(1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule.
 
 
 41
 Scofield v. NLRB, 394 U.S. 423, 430, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969). In concluding that the union rule at issue in Scofield did not violate section 8(b)(1)(A), the Court held that the rule "left the collective bargaining process unimpaired" and "breached no collective contract." Id., 394 U.S. at 436, 89 S.Ct. at 1161. Thus, it was "impossible to say that it contravened any policy of the Act." Id.
 
 
 42
 In the case before us, the NLRB found that the Union's conduct violated the strike settlement agreements. Stayton Canning, 275 N.L.R.B. at 916. The Union and the employers stipulated during the hearing before the ALJ that the strike settlement agreements and the collective bargaining agreements were negotiated as part of a single package. Thus, any violation of the strike settlement agreements would be a violation of the collective bargaining agreements. Accordingly, because the Union violated the provisions of the strike settlement agreements, as incorporated into the collective bargaining agreements, the Union's conduct "contravened" the right of the financial core members to refrain from observing the Union's work stoppage. 29 U.S.C. Sec. 157; Scofield, 394 U.S. at 430, 436, 89 S.Ct. at 1158, 1161. In addition, the Union's conduct violated section 8(b)(1)(A) by contravening the NLRA's policy of encouraging collective bargaining agreements. See eg. Stationary Engineers Local 39 (San Jose Hospital), 240 N.L.R.B. 1122, 1124 (1979) (conduct in violation of an amnesty agreement that is the product of negotiation between the parties interferes with the NLRA's policy of encouraging collective bargaining and therefore violates section 8(b)(1)(A)).
 
 
 43
 The Union argues that section 8(b)(1)(A) authorizes the discriminatory action against financial core members because it permits a union to prescribe rules concerning union membership. Even if section 8(b)(1)(A) can be read to permit the discrimination shown by this record, in signing the strike settlement agreement, the Union expressly waived any right it may possess to discriminate against financial core members who crossed the picket line in order to eliminate "bad feelings and disharmony" in the employers' plants.[2] The Union's argument that the strike settlement agreement was not intended to preclude reduction of rights and benefits after the strike directed at the financial core members who crossed the picket line is not persuasive. The Union's interpretation of the plain words of the strike settlement agreement would negate the clearly expressed intention of the parties to protect workers who crossed the picket line from discriminatory reprisals after settlement of the strike. Because this action involves financial core members employed prior to the strike settlement agreement, the question whether section 8(b)(1)(A) authorizes the Union to apply such restrictions against persons hired after the strike was settled, as incentives for full union membership, is not now before this court. Furthermore, we cannot, on these facts, reach out to decide the question whether the strike settlement agreement precludes the Union from applying restrictions based on benefits established after the strike to financial core members who crossed the picket line. Our jurisdiction in this matter is limited to the case and controversy presented by the fact that the union reduced benefits previously available to financial core members who crossed the line.
 
 
 44
 The Union also contends that the NLRB erred in finding a violation of section 8(b)(1)(A), based on the strike settlement agreements, because this theory was neither plead nor litigated before the ALJ. The NLRB complaint in this action alleged a violation of section 8(b)(1)(A) that was independent of the claim that the Union violated the strike settlement agreement. The Union argues that it was not given an opportunity to litigate this issue because the complaint's allegation of a violation of section 8(b)(1)(A) did not contain any reference to the strike settlement agreement. We disagree.
 
 We have consistently held that
 
 45
 [a]ctions before the [NLRB] are not subject to the technical pleading requirements that govern private lawsuits. NLRB v. Carilli, 648 F.2d 1206, 1210 (9th Cir.1981). The charge need not be technically precise as long as it generally informs the party charged of the nature of the alleged violations. Id. Moreover, where the issue is fully and fairly litigated at the administrative hearing, the [NLRB] may find an unfair labor practice even though no specific charge is made in the original complaint. Clear Pine Mouldings, Inc. v. NLRB, 632 F.2d 721, 728 (9th Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981); NLRB v. Olympic Medical Corp., 608 F.2d 762, 763 (9th Cir.1979).
 
 
 46
 Industrial Tech. and Prof. Employees Div., Nat'l Maritime Union v. NLRB, 683 F.2d 305, 307-08 (9th Cir.1982). Accord, George C. Foss Co. v. NLRB, 752 F.2d 1407, 1411 (9th Cir.1985). The question whether the Union violated the strike settlement agreement was squarely presented in the complaint. This question was the critical issue at the hearing before the ALJ. It was also the basis of the alleged violations of sections 8(b)(3) and 8(d). Accordingly, the Union was given a full and fair opportunity to litigate the question whether the strike settlement agreements were violated.
 
 D. Section 8(b)(3) and 8(d) Claims
 
 47
 The NLRB found "that the sections of the strike settlement agreements violated by the [Union's] conduct constitute mandatory subjects of bargaining." Stayton Canning, 275 N.L.R.B. at 918. Thus, the NLRB found "that by violating the strike settlement agreements that [the Union] violated Section 8(b)(3) and Section 8(d) of the Act...." Id. at 919.
 
 
 48
 Section 8(b)(3) makes it an unfair labor practice for a union "to refuse to bargain collectively with an employer...." Section 8(d) states in pertinent part that
 
 
 49
 [f]or the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other items and conditions of employment.... Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract ...
 
 
 50
 unilaterally and without notice to the other party.
 
 
 51
 The Supreme Court has held that "within the meaning of Sec. 8(d) ... a 'modification' is a prohibited unfair labor practice only when it changes a term that is a mandatory rather than a permissive subject of bargaining." Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 185, 92 S.Ct. 383, 400, 30 L.Ed.2d 341 (1971). Subjects of mandatory bargaining "includes only issues that settle an aspect of the relationship between the employer and employees." Id. at 178, 92 S.Ct. at 397. The NLRB's "judgment as to what is a mandatory bargaining subject is entitled to considerable deference." Ford Motor Co. v. NLRB, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979).
 
 
 52
 The NLRB found, in the matter before this court, that the nondiscrimination clause in
 
 
 53
 the strike settlement agreements settle an aspect of the employment relationship between the Employers and their employees. The purpose of these sections was to assure that those employees who worked during the strike would not be the subject of adverse action by the [Union] because they had chosen to work during the strike and in connection with this choice had opted to become financial core members so as to avoid being penalized by [the Union] for their refusal to support its strike. In other words the sections of the strike settlements which [the Union] violated involve a highly significant aspect of the employment relationship between the Employers and their employees, namely, the employees' decision whether or not to work for the employers during [the Union's] strike.
 
 
 54
 Stayton Canning, 275 N.L.R.B. at 918. Finally, the NLRB held that strike settlement agreements "appear to play a significant role in helping the parties to develop mutually acceptable compromises during the course of the negotiations leading to a cessation of a strike and a peaceful settlement of the dispute, which is, of course, the primary purpose of the Act." Id. at 919.
 
 
 55
 The Union has failed to present any argument that would persuade us to decline to defer to the NLRB's conclusion. We believe that the NLRB's finding that the strike settlement agreement's nondiscrimination clause settles an aspect of the employer-employee relationship is reasonable. Without the strike settlement agreements, it would have been more difficult to settle the strikes because of the fear of retaliation against employees who chose to cross the picket line during the strike.
 
 
 56
 A labor organization which, in violation of sections 8(b)(3) and 8(d), unilaterally, and without serving notice or following the requirements of section 8(d), purports to modify the terms of a strike settlement agreement that has been incorporated into a collective bargaining agreement, is guilty of violating sections 8(b)(3) and 8(d). Assoc. Home Builders of Greater East Bay v. NLRB, 352 F.2d 745, 750-52 (9th Cir.1965). We agree with the NLRB's holding that the strike settlement agreements involve mandatory subjects of bargaining. Because there is substantial evidence to support the NLRB's finding that those agreements were violated, we conclude that the Union violated sections 8(b)(3) and 8(d).
 
 E. Remedy
 
 57
 The Union argues that the NLRB erred when it "ordered a remedy for the entire class of financial core employees, without requiring any identification of members of the class at the hearing." The Union contends "that a remedy should not include employees who were not named in the hearing."
 
 
 58
 The NLRB, in fashioning the remedy, ordered that "[t]he identity of the financial core members affected by the [Union's] unfair labor practices and the amount of financial loses [sic] they may have suffered as the result of said unfair labor practices shall be left to the compliance stage of this proceeding." Stayton Canning, 275 N.L.R.B. at 919. In rejecting the Union's argument that only those who were specifically identified during the hearing should be remedied, the NLRB found that the Union's
 
 
 59
 unfair labor practices were not directed toward several employees but against a whole class of employees numbering in the hundreds. Under the circumstances leaving the determination of the identity of the employees who suffered financial loses [sic] as a result of [the Union's] unfair labor practices for the compliance stage of this proceeding represents an orderly and efficient means for processing a[n] ... order of this kind, particularly since the [Union] waited until the hearing had opened in this case before objecting to this procedure.
 
 
 60
 Id.
 
 
 61
 The NLRA gives the NLRB the power to issue an order requiring a party who has committed an unfair labor practice to "cease and desist from such unfair labor practice, and to take such affirmative action ... as will effectuate the policies" of the NLRA. 29 U.S.C. Sec. 160(c) (1982). This statutory command has been interpreted "as vesting in the [NLRB] the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 898-99, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984). Consequently, "a reviewing court's scope of review of the [NLRB's] remedial orders is narrow. The [NLRB's] choice of remedies will not be disturbed on review in the absence of a clear abuse of discretion." General Teamsters Local No. 162 v. NLRB, 782 F.2d 839, 844 (9th Cir.1986). A remedial order should stand unless it is "shown that the order is a patent attempt to achieve ends other than those that can be fairly said to effectuate the policies of the Act." NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 433, 600 F.2d 770, 777-78 (9th Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).
 
 
 62
 The NLRB did not abuse its discretion in leaving until the compliance stage the identification of those financial core members who were injured by the Union's discriminatory actions. As we have held previously, "leaving the identification of the discriminatees ... to the compliance stage of the proceedings represents an orderly and efficient means for processing ... orders...." Id. at 779.
 
 
 63
 ENFORCEMENT GRANTED.
 
 REINHARDT, Circuit Judge, dissenting:
 INTRODUCTION
 
 64
 The majority upholds an NLRB decision and order that defies reason and contravenes elementary principles of labor law. The majority, like the Board, concludes that a strike settlement agreement intended to protect strikebreakers against retaliation for their past conduct compels the union to afford those individuals all of the rights and privileges enjoyed by full union members even though they refuse, months after the strike, to accept full membership status. According to the majority's reasoning, the non-retaliation clause obligates the union to afford all its members, including those core members who elect to accept only limited union duties and responsibilities, the same rights and privileges of full membership. Thus, in this case, the core members can insist that they will not accept any of the obligations of union membership and at the same time demand that they receive all the benefits. Such an extraordinary result is not only contrary to the strike settlement agreements but also to the law on which the majority relies.
 
 
 65
 A union has a statutorily protected right to afford greater benefits to full members than to financial core members. A necessary corollary of this rule is that core members are not entitled to all of the rights and privileges that full members enjoy.[1] Neither the Board nor the majority is willing to acknowledge this rule. Yet it is not possible to evaluate the union's actions in this case fairly without starting from the premise that a union has the right to limit the benefits of core members. Because of their failure to recognize this principle, it is not surprising that both the Board and the majority conclude that the union's policy is retaliatory and therefore unlawful.
 
 
 66
 The evidence the majority relies on to support the Board's findings, including the isolated statements of office personnel and one union representative, does little more than establish that the union exercised its right to deny certain extracontractual benefits to core members, a fact that is not contested. Critical to the majority's conclusion regarding discriminatory animus is its suggestion that the union effectively prevented core members from converting to full membership status. Here, the majority attributes to the Board an inference that the Board itself never made. Further, the majority ignores the undisputed testimony that a number of employees who crossed the picket line and became financial core members did in fact convert to full membership status after the strike. Finally, the majority violates a fundamental tenet of administrative law when it affirms the judgment of the Board on a ground not invoked by the Board. Without this crucial ground to support it, and without any other evidence sufficient to support a finding of discriminatory animus, there is simply no basis for the result the majority reaches.
 
 I. LEGAL BASIS FOR THE UNION'S POLICY
 
 67
 Section 8(b)(1)(A) of the NLRA makes it an unfair labor practice for a union to "restrain or coerce ... employees in the exercise of the rights guaranteed in Section 7." However, the proviso to section 8(b)(1)(A) provides that that section "shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein."[2] The challenged policy is clearly protected under this section of the Act.
 
 
 68
 The proviso preserves the right of unions to adopt rules governing internal matters such as membership. Thus, 8(b)(1)(A) affords unions the authority to determine the rights and privileges that all members of the union, including core members, will enjoy. Upon examining the legislative materials dealing with section 8(b)(1)(A), the Supreme Court noted that "there are a number of assurances by its sponsors that the section was not meant to regulate the internal affairs of unions." NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 186, 87 S.Ct. 2001, 2009, 18 L.Ed.2d 1123 (1967). Section 8(b)(1)(A), hence, does not invalidate internal union rules even if they tend to restrain or coerce employees exercising their rights under section 7. However, internal union rules are not exempt from the strictures of section 8(b)(1)(A) if they have an external effect, i.e., if they affect employment status.
 
 
 69
 The Supreme Court has adhered to the distinction between internal and external enforcement of union rules and has made it clear that section 8(b)(1)(A) applies only to the latter. See, e.g., Pattern Makers' League of North America v. NLRB, 473 U.S. 95, 102-03, 105 S.Ct. 3064, 3068-69, 87 L.Ed.2d 68 (1985). Internal union regulations that do not affect the employment status of the employees generally do not run afoul of the prohibitions embodied in section 8(b)(1)(A). For, as the Allis-Chalmers Court explained, "Congress did not propose [by means of section 8(b)(1)(A) ] any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status." NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. at 195, 87 S.Ct. at 2014. See also NLRB v. Boeing Co., 412 U.S. 67, 73-74, 93 S.Ct. 1952, 1956, 36 L.Ed.2d 752 (1973) (under 8(b)(1)(A), the NLRB has "authority to pass on those rules affecting an individual's employment status but not on his union membership status"); NLRB v. International Ass'n of Bridge, Etc., 600 F.2d 770, 777 (9th Cir.1979) (section 8(b)(1)(A) makes it unlawful for unions "to act in an unreasonable, arbitrary, or invidious manner in regard to an employee's employment status"), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).
 
 
 70
 It is also well established that a union may withhold from non-members extra-contractual services and benefits "in full conformity with [its] right to regulate its internal affairs." NLRB v. Amalgamated Local 286, U.A.W., 222 F.2d 95, 98 (7th Cir.1955) (group and hospitalization insurance coverage). In Del Casal v. Eastern Airlines, Inc., 634 F.2d 295 (5th Cir.1981), the Fifth Circuit declared "that a union is not obligated to extend those internal benefits enjoyed by its members to nonmembers." Id. at 300. For similar reasons, a union may withhold extra-contractual benefits from non-full members or financial core members.[3]
 
 
 71
 There are practical consequences that flow from an employee's decision to opt for limited rather than full union membership. For example, "an employee required by a union security agreement to assume financial 'membership' is not subject to union discipline." Pattern Makers' League of North America v. NLRB, 105 S.Ct. at 3071 n. 16 (1985). Financial core employees place themselves outside the reach of union rules. By the same token, they renounce their right to participate in the internal conduct of union business. They "[are] 'member[s]' of the union only in the most limited sense." Id. (emphasis supplied). Their association with the union is confined to the collective bargaining process. Therefore, financial core members can only demand nondiscriminatory representation. Cf. Abood v. Detroit Board of Education, 431 U.S. 209, 221 n. 15, 97 S.Ct. 1782, 1792 n. 15, 52 L.Ed.2d 261 (1977) (duty of fair representation). They are not entitled to any of the other benefits that union membership entails. See generally C. Morris, The Developing Labor Law 1365-67 (1983 & Supp.1987); R. Gorman, Labor Law 644-46 (1976).
 
 
 72
 There are several reasons why unions provide a wide range of benefits and make them available only to those willing to accept the advantages and obligations of full membership. The simplest is a desire to service the needs of its full members. Another is to afford those persons a tangible reward for accepting the responsibilities of membership. A third is to create practical incentives for other employees to join the union and participate fully in its affairs. All these are valid and lawful reasons, particularly in light of the proviso to section 8(b)(1)(A).
 
 
 73
 The federal labor laws not only allow but encourage unions to engage in legitimate efforts to increase their active memberships. Unions play a central role in our national labor policy. In the words of the Supreme Court: "National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions." NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. at 180, 87 S.Ct. at 2006. An increase in full membership augments unions' bargaining power and, consequently, their effectiveness in carrying out national labor policy. In Allis-Chalmers, the Court declared expressly: "Integral to this federal labor policy has been the power in the chosen union to protect against erosion [of] its status under that policy...." Id. at 181, 87 S.Ct. at 2007. Thus it is fully consistent with national labor policy for unions to offer full members extra-contractual benefits and to use these benefits as an inducement to non-members or core members to step up to full membership status.
 
 
 74
 Similarly, the denial of union-provided extra-contractual benefits to core members does not constitute unlawful coercion against employees who choose to exercise their right to refrain from union activity.[4] Employees are not entitled to have it both ways. They cannot insist that they will not accept any of the obligations of union membership and at the same time demand that they receive all of the benefits. Consequently, absent some additional factor that would bring them within the strictures of 8(b)(1)(A), the policies adopted by the union in this case relate to internal union affairs, are exempted from the section and are protected by the proviso. Rather than prohibiting the union's policies, section 8(b)(1)(A) was meant to protect precisely the type of conduct in which the union engaged. The failure of the majority and the Board to recognize this point makes it impossible for them properly to evaluate the union's motivation or the legality of its conduct.[5]
 
 
 75
 The Board and the majority also ignore the fact that the union had compelling reasons for adopting the challenged policies. Not one of those reasons is given credence in either opinion. The Board seizes on the fact that it was only after the strike that the union adopted a rule limiting the rights of core members. Yet, it was only after the strike that the union faced, for the first time in its history, the need to adopt rules governing the rights and privileges of financial core members. "Prior to its strike against the Employers [the Union] did not represent a single employee who was a financial core member." ALJ op. at 8, reprinted in 275 N.L.R.B. at 915. Consequently, when the strike ended, the union had an obligation to define the respective rights and privileges of its full and financial core members. To be sure, in carrying out that duty, the union was not free to undermine or affect in any way the employment status of its financial core members. Nor could the union penalize or in any way discriminate against those employees who crossed the picket line or chose financial core status but were willing to return to full membership. In other words, the union was required to formulate an internal policy that did not affect any employee's employment rights or single out or discriminate against any employee for his or her past conduct--and that is precisely what the union did.
 
 
 76
 While under ordinary circumstances it would be reasonable for a union to afford greater benefits to full members than to financial core members, here the Union had additional cause for its actions. The union was legitimately concerned over the loss of a large number of its full members during the strike. It had every reason to look for ways to help restore the participation level that it had achieved before the strike commenced. It could, certainly, offer new extra-contractual services to its full members as part of a concerted effort to persuade financial core members to re-join. Alternatively, the union could, as it did here, limit the currently-provided benefits which were extra-contractual in nature and not subsidized by union dues to persons who were willing to become, or remain, full members.
 
 II. THE STRIKE SETTLEMENT AGREEMENTS
 
 77
 As demonstrated in Part I supra, the union had a statutory right to limit the privileges and benefits afforded to core members. To the extent that it is possible to reconcile the Board's and the majority's analyses with the National Labor Relations Act, 29 U.S.C. Secs. 141, 158, their argument would appear to be that by signing the strike settlement agreements the union somehow waived this right, in whole or in part. Accordingly, I next consider the meaning of the strike settlement agreements and whether the union's conduct violated their provisions.
 
 A. Waiver of Statutory Right
 
 78
 The strike settlement agreements provide in pertinent part:
 
 
 79
 The union and the company hereby agree that no employee shall be discriminated against in any way by virtue of lawful activity engaged in during or in connection with the strike....
 
 
 80
 Neither party shall discriminate or seek any penalty from any employee, including supervisory employees, because of their choices or actions with respect to financial core status or resignation.
 
 
 81
 A principal purpose of the agreements was to preclude punishment by the union of its members for their past acts. As with many strike settlement agreements, the parties here each agreed not to retaliate against the other's partisans for actions taken while the economic warfare was in progress.
 
 
 82
 The agreements cannot reasonably be read as permanently or indefinitely prohibiting the union from limiting union-provided benefits to those who are willing to accept current full membership status, or from establishing prospectively two different categories of membership governing full and financial core members respectively, with two different sets of responsibilities and two different sets of correlative rights. The agreements neither state nor contemplate that all employees must be afforded identical rights and benefits regardless of what membership decisions they make on a continuing basis after the strike has ended. Thus, under the settlement agreements, the union remains free to take ordinary measures to govern itself, to regulate membership, to determine what benefits and privileges its members will enjoy, so long as it does not discriminate on the basis of strike-related conduct. Clearly, when the union agreed not to retaliate against non-striking employees, it did not waive its statutorily protected right to limit the privileges of core members.
 
 
 83
 In the alternative, it could be that both the majority and Board believe that the strike settlement agreements, while not serving to waive entirely the union's rights under section 8(b)(1)(A), constitute a partial waiver of such rights. Under this theory, the strike settlement agreements serve to limit the union's otherwise lawful conduct only if the conduct is motivated by discriminatory or retaliatory animus. For purposes of my dissent, I will assume that the majority relies on this latter theory, and, in that light, will analyze its argument that the union acted out of discriminatory animus.
 
 B. Discriminatory Animus
 
 84
 As noted earlier, the question whether the union acted with discriminatory animus must be considered in light of the fact that the union had a statutorily protected right to limit the rights and privileges afforded core members, to treat them differently from its full members. See supra Part 1. Both the majority and the Board fail to recognize this point. This failure causes them to view otherwise innocent behavior as highly suspect, and as supportive of a finding of discriminatory motive. When the union's conduct is viewed in its proper context, its actions are readily characterized as eminently reasonable and justifiable.
 
 
 85
 Moreover, the most critical allegations the majority utilizes to sustain the Board's finding of discriminatory animus were not relied on by the Board and may not properly be relied on by the majority. The remainder of the evidence it cites is marginal at best and would be deemed either irrelevant or inadmissible hearsay were it introduced in a court of law.
 
 1. Strikebreakers as core members
 
 86
 The majority places great emphasis on its assertion that the evidence is undisputed that the only "victims" of the union's challenged policy were financial core members who crossed the picket line. See maj. op. at 1254-1255. While this may be true, it is wholly beside the point. There are no other financial core members; if there were, under the union's rules they would receive the identical treatment. As pointed out earlier, some rule was required when a new category of members emerged, and there is absolutely nothing suspect either about the fact that a rule was adopted, or that it provided that financial core members would receive fewer benefits than full members. Also, the issue is not whether the policy disadvantages core members--and the Board and the majority go to great lengths to establish this uncontested point--but whether the policy discriminated against non-striking employees because of their conduct during the strike. The facts clearly demonstrate that core members do not receive different treatment because of their strike-related activities. They receive different treatment only if they currently--months after the strike has ended--refuse to participate in the affairs of the union and currently elect not to become eligible for the full range of benefits. As long as an employee is currently willing to accept full membership, he is entitled to all of the union-provided benefits--irrespective of what actions he took during the strike.[6]
 
 
 87
 Given these facts, it cannot reasonably be said that the union's policy is one of retaliation for past conduct. Indeed, as the NLRB noted, "employees who chose to work during the strike, but did not resign their [union] membership" receive exactly the same benefits as full members who wholeheartedly supported the strike. ALJ op. at 10, reprinted in 275 N.L.R.B. at 916. Equally important, individuals who converted to financial core membership status during the strike and subsequently reinstated their full memberships receive all of the benefits of full membership. It is clear from these facts alone that the challenged policy does not penalize individuals because of strike-related conduct.
 
 
 88
 In short, while financial core members receive fewer benefits, it is not because they chose to become financial core members during the strike. They can receive the full benefits of union membership whenever they wish to do so. They need only do what all the other persons who receive those benefits have done--become full members of the union. Thus the fact that all the core members are individuals who worked during the strike does not by itself support any inference that the union's action was motivated by discriminatory animus.
 
 
 89
 2. Statements suggesting discriminatory animus
 
 
 90
 The majority next refers to four isolated statements that it apparently believes show that the union's actions were retaliatory in nature and therefore violated the strike settlement agreements. See maj. op. at 1254-55.[7] The first statement was purportedly an admission of an office manager as to the purpose of the rule. However, the statement in no way pertains to the reasons why the rule was adopted. If anything, it only relates a somewhat inaccurate description of the scope or effect of the rule. Equally important, an office manager does not participate in any way in the formulation of union policy, is not normally knowledgeable as to the motives underlying the union's decisions, and her statements cannot serve to bind the union on the issue of motivation. The second statement was purportedly made by an unnamed "office worker", and the third by "someone in the Union's office". Again, these hearsay statements, the contents of which were also far from definitive, cannot serve to bind the union, and provide no insight into the union's motivation. The only statement purportedly made by a union official was made by Marty Dolan, a business representative. Dolan simply told a core member that in order to reinstate his full membership he should write a letter explaining why he signed financial core and crossed the picket line, and also why he wanted to be reinstated. Clearly, this statement does not serve to establish the basis of the union's decision to adopt the challenged policy.
 
 
 91
 When viewed separately or together, the four isolated snippets, consigned to a footnote in the Board's opinion[8], do little more than demonstrate the actual if undisputed existence of the challenged policy. They in no way constitute the substantial evidence as to motivation needed for this court to affirm the Board's order.
 
 
 92
 3. Denial of union facilities to core members
 
 
 93
 The majority also claims to find "additional support" for its conclusion that there is substantial evidence of discriminatory animus in the fact that core members were denied use of the union's building facilities. The majority's reliance on this evidence--even if only to provide additional support for its judgment--again reflects its failure to understand that the union may legitimately proscribe rights, privileges and benefits of core members, so long as employment status is not affected. Indeed, under the proviso to section 8(b)(1)(A), the union may make core membership as unattractive as possible.
 
 
 94
 Nor is it relevant that members of the public were entitled to use the facilities. Such persons, unlike core members, have not rejected full union participation; nor can the union offer them an all or nothing full membership option. Clearly, the union has nothing to gain from denying the use of its facilities to the general public. However, the union does stand to benefit if core members are denied every possible privilege and as a result are given additional incentive to become full members.
 
 
 95
 4. Ability of core members to become full members
 
 
 96
 Perhaps most important to the majority's conclusion that there is substantial evidence of discriminatory animus is its suggestion that the union effectively prevented core members from converting to full membership status. The majority refers to testimony by three core members who sent letters to union officials in early 1983 asking to become full members, and whose requests were still pending at the time of the administrative hearing that November. See Maj. op. at 1255-1256. My colleagues conclude that it was "proper for the NLRB to infer, from the Union's failure to act upon these requests for reinstatement to full membership, that the purpose of its December 1982 discriminatory action against financial core members was to punish them for crossing the picket line." Id. at 1256. Unfortunately for the majority's argument, no such inference was made by the NLRB.
 
 
 97
 Both the non-existent inference and the evidence of delay are fundamental elements of the majority's case. Had the Board made an inference of discriminatory treatment in reliance on evidence that the union refused to act on applications for full membership, and had the record as a whole justified the drawing of such an inference from such evidence, there would in all likelihood be sufficient basis for a finding of improper motivation. However, not only did the Board not make the inference relied on by the majority but it appears to have given no weight at all to the testimony regarding the alleged delays. Nowhere in its decision is any reference whatever made either to the evidence or the rationale upon which the majority relies. Moreover, the record contains undisputed testimony that a number of employees who crossed the picket line and chose to become financial core members did convert to full membership status after the strike, apparently without difficulty.
 
 
 98
 Thus the majority is simply incorrect when it suggests that the Board concluded that the union effectively prevented core members from converting to full membership status. Indeed, the only logical inference we can draw from the entire record and the Board's decision not to rely on the evidence of delay is that the Board concluded that the evidence was not sufficiently credible or probative to affect its judgment.
 
 
 99
 Finally, even if the majority's suggestion that core members were effectively prevented from converting to full membership status were correct, the judgment of the Board could not be affirmed on that ground. "[A]n agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.' " FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)). See also Industrial Union Dept. v. American Petroleum Institute, 448 U.S. 607, 631, 100 S.Ct. 2844, 2858, 65 L.Ed.2d 1010 (1980) (plurality opinion); FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 249, 92 S.Ct. 898, 908, 31 L.Ed.2d 170 (1972). Indeed, the Supreme Court has long held that we "must judge the propriety of such [administrative] action solely by the grounds invoked by the agency." SEC v. Chenery Corp., 322 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Here, the Board clearly did not purport to base its judgment on the inability of core members to convert. Thus the majority affirms the judgment of the Board in reliance on an entirely new ground, one never referred to by the Board. This it may not do.
 
 
 100
 The majority errs egregiously when it attributes to the Board an inference the Board never made, ignores the undisputed testimony that core members were free to convert, and upholds the Board's judgment on a basis not invoked by the Board. Without this critical underpinning, there is simply no adequate basis for the majority's decision.
 
 5. Conclusion
 
 101
 The Board's finding of improper motivation "amounts to little more than speculation". NLRB v. International Brotherhood of Electrical Workers, 827 F.2d 530, 537 (9th Cir.1987). "Weighed against this [speculative] evidence was the uncontroverted fact", id., that employees who crossed the picket line but did not become financial core members and employees who became financial core members during the strike but returned to full membership afterwards were both afforded full membership benefits and neither suffered reprisals. They were treated identically, in every respect, to those who fully supported the strike. Only those individuals who chose more than four months after the strike to reject full membership status and to continue in a dues-paying-only capacity were deprived of the benefits the union decided to afford only to its full members. The union admittedly sought to treat financial core members differently, to treat them in a far less favorable manner than full members. But, there is no substantial evidence in the record to support the Board's inference that it was motivated by a desire to retaliate against those members for their strike-related conduct. Accordingly, the Board's conclusion that the union breached the settlement agreements should not be affirmed. Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-89, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951).
 
 III. SECTION 8(b)(1)(A)
 
 102
 The majority reasons that because the challenged policies violate the strike settlement agreements, they also necessarily violate section 8(b)(1)(A). However, the union, on appeal, contends only that there was no "breach of those agreements". It does not contest the Board's conclusion that a breach of the settlement agreements constitutes a violation of section 8(b)(1)(A).[9] Accordingly, this court should not consider whether the breach constituted a violation of that provision. We should simply assume for purposes of this decision that the Board's conclusion is legally correct. The part of the majority's analysis which goes beyond determining whether a breach of the settlement agreement occurred constitutes unnecessary dicta and is of no binding force or effect.
 
 
 103
 In any event, I find both the NLRB's and the majority's reasoning tortured when they attempt to explain why a union's breach of a contractual agreement with an employer constitutes a violation of section 8(b)(1)(A), i.e., coercion of the employees in the exercise of their statutory rights. If, in the absence of the settlement agreements, the union could lawfully have taken the actions it did without violating the employees' statutory rights, I cannot understand how the breach of the agreements can transform those same actions into a violation of those statutory rights. I respectfully suggest that in basing its decision in part on section 8(b)(1)(A) the Board and the majority are simply relying on the wrong provision. The violations, if any, are of sections 8(b)(3) and 8(d).[10]
 
 CONCLUSION
 
 104
 The Board's holding that the challenged policies violate the non-retaliation provisions of the strike settlement agreements is based on erroneous legal principles and insufficient evidence. The majority's affirmance of the Board's order is even more flawed, since it relies on a basis not relied on by the Board.
 
 
 105
 There is simply no substantial evidence supporting the Board's conclusion that the union was motivated by discriminatory animus. The union's policy constituted a legitimate attempt both to define the respective rights and privileges of full and financial core members and to encourage employees to elect full union membership. The union lawfully exercised its power over its own internal affairs as contemplated by the proviso contained in section 8(b)(1)(A). Had the Board properly recognized the legal principles involved, it is unlikely that it would have arrived at its erroneous result.
 
 
 106
 For the foregoing reasons, I dissent.
 
 
 
 [1]
 Our dissenting colleague argues that we cannot rely on this evidence to uphold the NLRB's factual determination that the Union acted with discriminatory animus because it was not expressly relied upon by the NLRB in its opinion. Dissent at 1267. As stated above, in reviewing a decision of the NLRB, we are compelled to look at the record as a whole to determine whether there is substantial evidence to support the NLRB's factual determinations. Rockwood & Co., 834 F.2d at 839. Thus we cannot, as suggested by the dissent, limit ourselves to those portions of the record that the NLRB refers to in its decision. Evidence that financial core members found it difficult to regain full union membership clearly supports the NLRB's factual finding that the Union's actions were aimed at punishing financial core members for crossing the picket lines
 
 
 [2]
 Contrary to our dissenting colleague's assertion, see Dissent at 1260, 1262-63 n. 5, we do acknowledge the existence of a rule that allows a union to treat financial core members differently than full union members. We hold, however, that this right may be waived or limited by agreements between a union and an employer
 
 
 [1]
 There are two qualifications to the rule. First, the union must not discriminate against financial core members in a manner that affects their employment rights. See infra at pages 1260-62. Second, the union may not use certain funds to provide benefits that are not available to all of its members. See infra n. 3
 
 
 [2]
 Section 7, 29 U.S.C. Sec. 157 (1982), gives employees the right to refrain from labor organization activity "except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment...."
 
 
 [3]
 We need not consider here whether the rule would be different were the expenditure of union dues money involved or, alternatively, whether the financial core members would simply be entitled to a return of part of their dues payments. Cf. CWA v. Beck, --- U.S. ----, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988). The NLRB does not contend that any union dues money was expended in connection with the benefits at issue; neither does the majority. The union asserts unequivocally that no such funds were used and that the clinics and the pharmacy are self-sustaining non-profit business operations
 
 
 [4]
 As noted supra at pages 1260-62, in altering the incentive structure underlying union membership, the union may not undermine the employment rights of financial core employees. In International Ass'n of Machinists v. NLRB, 626 F.2d 119 (9th Cir.1980), we held that a union could not refuse to sell unemployment stamps--which employees off the payroll could use in lieu of regular dues--to non-members. The benefits withheld in Machinists clearly affected the employment status of the employees. The collective bargaining agreement required union membership in order to retain employment status, and the stamps enabled the unemployed to maintain their memberships
 
 
 [5]
 The Board expressly reserved the question whether the union's conduct would have violated section 8(b)(1)(A) in the absence of the strike settlement agreements. ALJ op. at 12 n. 8, reprinted in 275 N.L.R.B. at 917 n. 8. The majority shows even less awareness of the meaning of the section 8(b)(1)(A) proviso and appears to proceed from the incorrect premise that the union cannot treat core members differently from full members
 
 
 [6]
 The majority, unlike the Board, erroneously suggests that the union interfered with the right of core members to convert to full membership. I address this contention in Part II.B.4 infra
 
 
 [7]
 The majority opinion refers to two other statements that simply describe the fact that core members receive lesser benefits. See maj. op. at 1255. They require no further mention here
 
 
 [8]
 ALJ op. at 10 n. 5, reprinted in 275 N.L.R.B. at 916 n. 5
 
 
 [9]
 The union does assert that we are not free to consider this claim since it was not pleaded or litigated before the Board. I agree with the majority that the procedural error, if any, was not fatal
 
 
 [10]
 However, I conclude that the union did not violate either of these sections since, as I have already explained, its actions did not violate the strike settlement agreements. See supra Part II